The case for today is in Appeal Number 22-2806, the EEOC v. Village at Hamilton Pointe. Ms. Coleman, good morning. Good morning. And may it please the Court, Gail Coleman for the Equal Employment Opportunity Commission. Beginning with the verdict forms, the District Court is charged with knowing the law and submitting legally correct verdict forms to the jury. As submitted, the verdict forms in this case made it impossible for the jury to consider the totality of circumstances as required under Title VII. Mason said that when there are allegations of harassment from coworkers and supervisors, and then here residents as well, a jury must consider all of the harassment by all of the harassers together when determining whether there was severe or pervasive harassment. In Amons-Lewis, this Court made clear that whether a harasser is a coworker or a supervisor is relevant only to apportioning liability and not separately to whether there was in fact a hostile work environment. Here, the jury was required under these verdict forms to rule either that, looking only at supervisor harassment, there was enough harassment on its own to create a severe or pervasive hostile work environment, and then separately, looking only at coworker harassment, to decide there was enough coworker harassment on its own to create a severe or pervasive hostile work environment. Do the jury instructions support that approach? The jury instructions candidly were a little bit confusing. They were the pattern jury instructions, which really were designed for cases either where there was only coworker harassment or whether there was supervisor harassment. The EEOC did agree that it was necessary to have separate instructions because they did go to the different liability standards. There was a totality of circumstances instruction, but to the extent the instructions themselves were confusing, if the verdict forms had been correct, that would have eliminated any confusion. As it was, it truly was impossible for the jury to rule on the totality of circumstances. Even if the jury had deemed everybody involved in harassment to be a coworker, that still would not have reached the totality of circumstances because the form left no ability for the jury to also consider the role of the race-based assignment sheets. It's hard for me to see how, in keeping with what Judge Ripple is asking, it's hard for me to see how your client did not basically invite this error. Your verdict form that you submitted, which I have right here, seems to be materially the same as the one that was used. Yes, it looks a little bit different and all that, and your jury instructions, as Judge Ripple is underscoring with his question, very much treated the supervisor vis-à-vis the coworker and third party as separate claims. I mean, by their terms, they did. Respectfully, the jury verdict form that the EEOC submitted is not similar to the one that was actually submitted. The EEOC's proposal said first find was there a hostile work environment and then goes on to separate out the verdict form that was submitted. It doesn't say first look at everything and find was there a hostile work environment. It says was there a coworker hostile work environment, was there a supervisor hostile work environment. Those are different inquiries. Your verdict form didn't separate that out? Our verdict form said was there a hostile work environment. The jury should ask whether there was a hostile work environment. I thought your argument, you started with Mason. Yes. I thought your argument is you have to throw everything in the hopper. Yes. Put all the evidence in a bucket and ask the question once all the evidence is in the bucket, whether in this particular case, whether there's a racially hostile work environment. Then what you're saying is, well, based upon Mason, then what you need to do is you need to start pulling things out of the bucket. You need to engage in a filtering function. These are my words, not yours. The filtering required by Mason is to figure out those elements of any environment that's hostile, any work environment that's hostile, for which an employer can be liable. Yes. You agree with me so far? Yes, except for the filtering. I'm not clear on what you mean. You have all the evidence in a bucket, right, in the jury room. What do you do with it then? What the jury is supposed to do with it then is look at everything, everything together, and say, yes, looking at all of that, that was a severe or pervasive hostile work environment. Okay, and then what? And then, for purposes of apportioning liability, only at that point does the jury say, this amount was contributed to by supervisors, and therefore, there is this affirmative defense. This amount was coworkers, and for that, we look at whether the employer knew or should have known. That is strictly for apportioning liability. Okay, and so that apportionment requires a filtering. Yes. That's all I'm saying. I'm just picking a different word. Okay. Okay, but how does your verdict form require that? I got it right here. I don't see how it walks the jury through that kind of Mason framework, if you want to call it that. Your Honor, even if our verdict form was not perfect in the way it would have been, the verdict form that was actually in front of the jury certainly was not perfect, and again— Right, and that's why in the final morning, on the final morning of the jury conference, right, you should have objected to the verdict form. Well, at that point, Your Honor, yes, it would have been absolutely a better practice. No question to have objected at that point, but it was not unreasonable for the EEOC to believe at that point that there was no purpose because we had already objected very extensively in writing with a citation to case authority to exactly this problem before trial. We had explained the Mason problem that everything needs to be looked at together. It's very hard for me to see how you preserved this by submitting jury instructions that Judge Ripple referred to that separated this claim by claim, where you submitted a verdict form that does not set out the Mason framework, that does not set out that apportionment framework, and then when the final charge conference is happening, you don't preserve your objection. I don't know how you can get out from under plain-air review. I mean, when you say better practice, I think better practice is, in this circumstance, you're legally obligated to register the objection. Well, I will say that in OREC's credit alliance, this court did say it's not overly formalistic about waiver and that even in circumstances where a party did not formally object the way the rules would require, this court will excuse that in some circumstances. And here, because we did already make the court aware of exactly what the problem was with the proposed verdict form, this is the kind of circumstance that falls within OREC's credit alliance. But in any event, even if this court were inclined to look at this under plain-error review, we do still believe that warrants reversal. The exceptional circumstances here are that the district court already possessed our detailed and written objection, which is primed for appellate review. It's not as if we didn't say anything and now this court has nothing to look at. It was reasonable for us to believe at that point that further objection would have been futile and redundant. And then in terms of whether the legal error affected substantial rights, claimants do have a Title VII right to work free of a racially hostile work environment and they cannot have had those rights vindicated if their claims were assessed under an erroneous legal standard. Ms. Coleman, I think we have that point. I was very surprised, very frankly, that you started with the verdict form because it seemed to me that the 500-pound gorilla in this case is the question of whether accepting the fact that they should have looked at the jury was supposed to look at the totality of the circumstances. Do we have severe or pervasive harassment here? Are you talking about the trial or summary judgment claimants? Because the trial, there is no challenge on appeal regarding whether or not there was severe or pervasive harassment. The only question about trial on appeal is the verdict forms. But with respect to summary judgment, yes, there is an issue about severe or pervasive harassment. Tell me your position. Our position is, well, first of all, that is the only ground on which the district court granted summary judgment. There, the district court's error was by relying on Fifth Circuit law, not on the law of this court. The Fifth Circuit says that if patients have dementia, then harassment is just an expected part of the job. It can't be severe or pervasive, essentially, because it is what it is with individuals with dementia. This court has not only not said that, but has specifically said in Smith v. Sheehan that workers do not assume the risk of harassment by virtue of where they choose to be working. The fact that patients have dementia in this court is not a reason to discount the severity or pervasiveness of what they say or do. So under our standard, tell me, how is this severe or pervasive? Under this standard, residents have, I mean, there is testimony of race-based assignments, which in Cheney, this court said was the most significant factor in finding a hostile work environment. Employers can't do that. You can't tell someone, because you're black, you can't go into this room. Additionally, there were nine claimants who testified that they heard the N-word, many repeatedly. The most severe, harsh slur in the English language. This court has said it's so bad that there may even be occasions where hearing it just once, standing alone, is enough to create a hostile work environment. And of course, in this case, there is no claimant for whom that is the only thing that happened. There was other harassment as well. Apart from the N-word, people were called all sorts of hateful things. They were told, well, you people, blacks all look the same. I can't tell you apart. There's a litany of things that happened to you. I think we understand the record. Let me ask you another question. I'd like to know the EEOC's position on the question, if you want, of secondary harassment. In reading through all these papers, I kept thinking of the secondary smoke analogy, okay? You've got a lot in the record here about nobody ever called me the N-word, but I heard other people use it. To what degree, or what is the law with respect to secondary harassment? What's the established law? The established law under Gates is that repeated exposure to something can create a hostile work environment, even if it is secondary harassment. I like your example of smoke, because thinking of smoking, if you smoke a cigarette, that's pretty bad for you. But if you are exposed to secondhand smoke, it's not as bad, but it can still make you sick. That's the same principle here with harassment, that yes, of course it is worse for somebody to say to you, you are an N-word. And then going down, it's worse for you to hear someone say that about you. But to hear that racial slurs and harassment are sort of a standard thing in your workplace, even if it's not all directed at you, targeted at you, that does affect your perception of your work environment as a racially hostile place to work. It is relevant to the assessment of a hostile work environment. And whether something is targeted at someone, or even, for example, the claimants who are women who were offended by the sign, the posted sign saying, no African-American men to provide care. They're not men, but they are African-American individuals, and under euthanasia, they fall within the target area. Do you read our precedent as saying under no circumstances may the employer direct a person, a minority person, not to enter a particular room where the individual will react adversely to having that minority in the room? No, Your Honor, we don't. What Cheney has said is not that an employer is responsible for stopping every form of racial harassment in its environment. What an employer has to do is act reasonably to prevent and to correct. So there are a bunch of different ways that could happen. As Cheney said, Cheney listed a few of the possibilities. One is when residents first are admitted, tell them about the nondiscrimination policy and get their consent in writing. After admission, you can attempt to reform their behavior. It is wrong to assume, as the Fifth Circuit does, that all residents with dementia are the same. Some may have had an intent. Some may not have had an intent to say these things. Some may be amenable to being told you can't do that and may stop. We just don't know. An employer has to try. And then an employer can say on a race-neutral basis, I am telling my entire staff, black, white, whatever, all of you, if somebody is experiencing some kind of hostility in a room with a resident and you're not comfortable taking care of that person, come to us. We'll deal with it, but not on a race-based approach. I'm sorry. I see that my time is up. Say not on a race-based approach. Suppose a CNA comes out of the room and says, I am exposed by this demented patient, exposes me to the N word all the time when I'm in the room, repeatedly. I don't want to be in there. I've got to do something about this. Can the employer at that point reassign that individual to someone else's? Absolutely. And that's what we are suggesting, that the employer should be able to, that any employee, regardless of reason, who is faced with a hostile resident, should be able to come to the employer and say, please reassign me. It could be because they're being exposed to racism in that room. It could be because it's just a cranky person who does not want anyone. The reason I ask the question is in answer to the earlier question, you said that race couldn't be considered. Now you're telling me it can be considered as an accommodation. Well, no. Race can't be considered to say, because you are black, you cannot go into that room. That's my choice as your employer. The employee can say, because of my race, I am being attacked verbally by this person every time I go in, and so I am asking you to please protect me from that.  Yes, exactly right. I see. Has the, if I may, sir, before we go on, has the EEOC published any guidance in this whole area? Not to my knowledge, no. No, okay. Thank you very much. Thank you. Okay, Ms. Cohen, we'll give you a couple minutes for rebuttal. Thank you very much. We used a lot of your time with questions, but they were well placed. Appreciate it. All right, Ms. Martin, good morning. Good morning, Your Honors. May it please the Court. I am Lori Martin here today on behalf of two appellees. We have Appley Tender Loving Care Management, or TLC, and Appley Hamilton Point. Hamilton Point was the employer of each of the claimants on which summary judgment was granted. It was a consulting company, not an employer or joint employer, indirect employer. We ask that the summary judgments for Hamilton Point and TLC be affirmed and that the Court deny the EEOC's argument for reversal based on the verdict forms. I think the verdict form argument can be disposed of pretty quickly. We agree that argument was waived when the EEOC failed to object on the basis that it's currently arguing at the conference where the district court provided the opportunity to do so after it told the parties what verdict form it would be using. And so we are talking at most a plain error review here, and there is no plain error. The verdict form appropriately asked the jury to evaluate whether a hostile work environment existed and then compound question, essentially, was the hostile work environment created by supervisor conduct? Further down the verdict form, separate question asked, was there a hostile work environment created based on coworker or resident conduct? And so as far as how the jury was to determine a hostile work environment, instruction number 21, which did clearly support and was also proposed in virtually the same form by the EEOC, indicated that the jury should look at the totality of the circumstances as to each claimant and then proceed by evaluating whether supervisor or coworker harassment had occurred. This form didn't preclude the jury from considering any evidence. I don't know what type of evidence. The point that Ms. Coleman, though, I think is right about is even if you're correct that there was a waiver or were under plain error review because of the failure to object on that, you know, by registering the objection at the charge conference, it's very difficult for me to see how the jury instructions, the actual jury instructions, and for that matter the ones proposed by the parties, how they align with the framework that she described accurately, in my view, from Mason. So you may prevail on plain error review, but I really don't see how these instructions align with the substance of the case law, nor for that matter the verdict form. So in other words, you may say there's no plain error, but what I'm wondering about, are you sure there's not an error? We don't believe there's an error. So with the Mason line of cases in mind, walk me through how the instructions track with that. Sure. So as I read Mason and Ammons-Lewis, I believe that the case law clarifies that these are two distinct claims. A claim for supervisor harassment is a distinct claim. There are distinct legal burdens, affirmative defense that applies there. Then a claim for co-worker or third-party harassment that's under that co-worker. But do you agree that, in keeping with the point that Ms. Coleman was emphasizing, that, okay, yes, separate claims because the liability standards are different, but in the course of evaluating the evidence, all of the evidence needs to be considered together for purposes of answering the threshold question of whether the employee is exposed to a racially hostile work environment. Two points there. We think the way this is phrased, the jury was told to do that. They were asked, was claimant subjected to a hostile work environment? What are you looking at? I'm looking at the actual verdict form that was used in this case. I know it was in the district court docket at page 301. I think it's in the short appendix too. Yeah, go ahead. So has the EEOC proven by a preponderance of the evidence that, insert claimant's name, was subjected to a hostile work environment by Hamilton Point through supervisor harassment? So the first question there is, was the individual subject to a hostile work environment? Final instruction number 21. Keep reading like you did, by supervisor harassment. I mean, I will submit there is no potential for liability for Hamilton Point if there isn't a basis for employer liability. So this question perhaps condenses those inquiries. Yeah, that's the issue right there. But not incorrectly. Under the Mason case in particular, the court and Ammons-Lewis was clear that there isn't a circumstance where it would be appropriate for looking at that employer liability prong to consider co-worker conduct in relation to a supervisor harassment claim. And here the jury was also instructed on how to determine whether an individual was a supervisor. That was a disputed issue in the case. The EEOC could have indicated yes to the first question and yes to the second question if they believed an individual was subject to a hostile work environment and that both supervisor harassment and co-worker harassment contributed to that work environment.  Looking at totality of circumstances is enough. And so there is no error here. Ms. Martin, who is the supervisor here? So the claimants, and I'm jumping a bit maybe to our summary judgment claimants here, we have primarily CNAs, 13 certified nursing assistants, and two dietary aides. Their supervisors are the department managers, and their supervisors in a legal sense, as this court would define under Vance and Nishan, are the people empowered to hire, fire, discipline, promote, transfer. The EEOC throughout its briefing refers to nurses as though a nurse is a claimant's supervisor. That is simply not the case in a legal sense. Well, that insulates the nursing home though, doesn't it? I mean, as far as the CNA is concerned, the RN, the charge nurse, is gone. She's in charge. I think there's a couple ways. We see that in these cases, and it really grates. Something's got to be done, frankly, with the law there. With the law or with the training at the facilities maybe. But I think Nishan answers in the legal sense at least that the type of authority possessed by the nurses, you know, limited review, limited training, kind of day-to-day activities, isn't sufficient in a legal sense. You know, certainly the fact that it's a nurse, for whatever that's worth, can be considered in looking at severity and pervasiveness. But where it does become incredibly important, we think, is when we look at whether the facility was on notice. And the district court here didn't just deny or didn't just find summary judgment. There's where I really get uncomfortable because the charge nurse is on notice, and the charge nurse is the one who is directing the employee either to go or not go into the room. Are there any cases that have held that the charge nurse is at least the delegatee of the so-called supervisor, the guy in the air-conditioned office who knows nothing about what's going on on the floor? I haven't seen cases that deal with that particular context. It seems to me the company is just insulated in a very artificial way here. Well, so what we think should have happened, and what we think the court's case law supports in any context, is that to put an employer on notice, the individual needs to go to higher management or use any of the other forms available. There was a director of nursing here. There was an administrator. There was a third-party hotline that individuals could call in their own name or anonymously. Is there anything telling the CNAs to go to the director of nursing? The company's policies indeed did prohibit discrimination and harassment, including by residents, and it empowered and told employees where to report that, and that included the hotline administrator or director of nursing. I see. So, you know, this context is important, and another piece of that context is that it's part of a CNA's and a nurse's day-to-day job to talk about how a resident is doing. Did so-and-so refuse care? Did so-and-so, you know, were they, you know, in a mood today? Were they saying things that were inappropriate or unusual? And so we do see nurses dealing with that in particular situations and actually implementing the type of race-neutral decisions that, you know, perhaps Cheney would suggest are required after, you know, after a complaint has been raised. Cheney does not suggest that's a new independent element that must be proven before the employer's on notice. So the fact that a CNA came out and said, gosh, somebody was using inappropriate language today, that is part of their day-to-day job, and I think it's appropriate that they still be subject to the same standard where if I actually thought that was harassing as opposed to just noting how so-and-so was doing today, they had a path to do that and they failed to do that here. If they felt the nurse's response was inappropriate, they should have reported that to higher management. And we see only two claimants here ever reported anything to higher management. In both of those instances, we did see a prompt and effective response. Who were the two? Ms. Fletcher reported the PT assignment sheet that she – Is that Sonia Fletcher? Sonia Fletcher. Yeah. And she did go to the director of nursing. She did go to the administrator, and we see within days that that assignment sheet was removed, and she later went to the hotline a month after it had been removed, and we see additional response and training conducted after that. Ms. Tolliver, then, is the other individual who reported she heard a coworker, and to be clear, there's only two instances of alleged use of the N-word, only by coworker in those two instances, indirectly. Bianca Tolliver. Bianca Tolliver. She reported that she heard a coworker use that about someone else, and he immediately approached the employee. That employee apologized, and that did not recur between those two employees. Do you agree with your colleague on her assessment of a secondary harassment, secondary smoke problem? Is this actionable if nothing happens? If it's reported, is there an obligation to do something about it? What is the established law from your perspective? So I think this court definitely has made clear that whether we call it secondary or target area harassment is something less direct and something that is less likely to create a severe or pervasive hostile work environment for an individual. And here we're talking not only about secondary harassment but blatant hearsay. There were rampant rumors, you know, maybe not surprising, after the PT assignment sheet and after the EEOC putting it in front of people investigating this case, but rampant rumors about that practice that led to a lot of speculation, CNAs talking to each other, and the EEOC really asked the court to elevate that hearsay evidence to something that I think in the Johnson case this court has said it should not be elevated to, which is essentially stand-alone elements or stand-alone evidence sufficient to create a hostile and pervasive or severe and pervasive environment. So, yes, it matters if it was a supervisor, and here we really don't have supervisor conduct. We're talking about resident conduct. It matters if the conduct was a resident with cognitive impairment, and each of these individuals is really hired to and trained to manage and work with people with those types of behaviors. We did not argue any type of assumption of risk defense, and the district court did not find any type of defense like that, but the context of the workplace does matter, and that's under this court's jurisprudence in cases instructing to look at the relationship between the harasser and the harassed employee. Ms. Martin, can I, in the time we have remaining, let me just focus on TLC for a second, the management company. With respect to liability, my question goes to what liability are we talking about holding TLC responsible for? So there's one instance that would seem quite clear to me, and that is that suppose for discussion purposes we reverse the entry of summary judgment for the 15 employees. We agree with the commission on that. Then you'd have 15 employees that would be headed to trial, correct? Okay, and then the TLC question would seem quite ripe as to them. Okay, in other words, well, we need to answer yes or no. TLC can or cannot be considered a joint employer. There's either question of fact on that or there's not. Okay, but in the event that we ruled for you and affirmed the entry of summary judgment on the 15 employees, what other liability could we possibly be talking about? I know there's a jury verdict that came back in favor of, I don't remember the name. Mr. Rochon Middleton. Rochon Middleton, right, okay. But I don't see the commission arguing that they're seeking to hold TLC liable for liability for the verdict that Middleton received. So what liability are we talking about? I would agree with you, and if the court wanted to resolve this by saying there are no claimants who have claims, period, or those claims have already been resolved at trial, perhaps the joint employment issue doesn't need to be reached. But the EEOC was seeking to hold both companies liable for the individual alleged assets. But in their procedural posture now, I don't see them arguing. I can't think of one passage in their brief where they're talking about, you know, Hamilton Point has refused to pay liability or something on the Middleton's verdict, and therefore we want TLC to pay up on that. And that judgment has been satisfied. I don't know that it's been released. No, I agree there is not any separate liability, and we'll rest on our briefing on the remaining arguments unless there are additional questions. Okay. Hearing none, very well. Thank you. Thank you. Ms. Coleman, we'll give you a couple minutes. Thank you. I have just a few quick points I would like to make. First, with respect to the rumors, this court did hold in Johnson or say in Johnson that rumors themselves may be relevant to a hostile workplace environment. Obviously, again, not the strongest evidence, but they can be relevant because rumors themselves can be hurtful, and in this case, Hamilton Point quite easily could have stopped the rumors. The rumors were that Hamilton Point did not allow black employees to go in certain rooms because of their race. Hamilton Point could have said to the employees, this is just not true, and stopped saying it. Of course we don't bar black employees from going into rooms because of their race. This would have been an easy fix, but they didn't, and the rumors continued. I'd also like to say that Hamilton Point is making much of the failure of several of the claimants to formally complain and follow their procedures. That is not the standard for whether or not Hamilton Point could be held liable. The standard is whether they knew or should have known about the harassment. Enough people said enough things to enough people that a jury could find that they should have known. There were two complaints to the hotline. There were complaints to the administrator, to the director of nursing. There was enough to raise red flags here, where someone should have come in and said, let's take a look. So that didn't happen, and a jury could find on that basis, regardless of whether any particular individual followed the handbook procedures for complaining, that Hamilton Point knew or should have known and should have looked into it. The sense that because the assignment sheet saying no African-American employees to provide care came down three days after it was first brought to the director, or brought to Hamilton Point's attention, after four different complaints, a jury could find that no, that was not a prompt and effective response, and that leaving it up for three days was quite harmful and humiliating. And then I would also like to point out that in some cases, we know that there were some claimants who were experiencing vicious racial harassment when they went into a residence room and said, I am a professional. I'm going to do my job, and I'm going to go here anyway. That does not give Hamilton Point the right as an employer to say no, because you're black, you won't go in. What it does is it requires Hamilton Point to protect that employee. Yes, she's a professional, she's going in, but she shouldn't have to be exposed to this. Now, Hamilton Point may not be able to make it stop, but it needs to try. It needs to do something, and a jury could find here that not only did Hamilton Point not try to fix things, but Hamilton Point actually affirmatively made things worse. So if there are no further questions, thank you very much. Okay, thanks to both parties, counsel for both parties. We'll take the appeal under advisement.